STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

JAC 24-66


STATE IN THE INTEREST OF

P.P. AKA P.W.



\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 2022-CC-58
HONORABLE HARRY FRED RANDOW, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**GUY E. BRADBERRY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Charles G. Fitzgerald, and Guy E. Bradberry, Judges.


**AFFIRMED.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**2720 Rue de Jardin, Suite 100**
**Lake Charles, LA 70605**
**(337) 436-2900**
**COUNSEL FOR APPELLANT:**
  **D.P. (father)**

**Clifton John Spears, Jr.**
**Assistant District Attorney**
**Ninth Judicial District Court**
**726 Washington Street**
**Alexandria, LA 71301-8023**
**(318) 473-6650**
**COUNSEL FOR:**
  **State of Louisiana**

**Dmitrc Ian Burnes**
**Dmitrc I. Burnes Law Office**
**720 Murray Street**
**Alexandria, LA 71301**
**(318) 442-4300**
**COUNSEL FOR APPELLANT:**
  **D.P. (father)**

**Maria A. Losavio**
**Losavio Law Office, LLC**
**1821 MacArthur Drive**
**Alexandria, LA 71315**
**(318) 767-9033**
**COUNSEL FOR:**
  **P.P. AKA P.W. (minor child)**

**BRADBERRY, Judge.**

(D.P.)[1], the father of a child adjudicated a child in need of care, appeals a trial court judgment changing the case plan goal from reunification to adoption. For the following reasons, we affirm the judgment.

## FACTS

This case was originally before this court after the trial court ruled that P.P. (the child) was a child in need of care. The facts were set forth in that case as follows:

> The mother, L.W., gave birth to her daughter, P.P., on August 9, 2022. On August 11, 2022, the Department of Children and Family Services (DCFS) received a report that P.P. was a drug-affected newborn, showing signs of withdrawals. P.P. had a low-grade fever, poor feeding, mild tremors when disturbed, and increased muscle tone. The baby's meconium drug screen was pending. According to hospital personnel who were questioned by DCFS, L.W. tested positive for amphetamines and admitted to using fentanyl and methamphetamines. She reported that she had been using IV methamphetamine and fentanyl on and off for the past two years and that she had received methadone from a drug treatment clinic, but that it was not enough to satisfy her cravings.
>
> DCFS filed for and obtained an oral instanter order of removal on August 17, 2022, followed by a written order on August 18, 2022, placing P.P. in the provisional custody of the State of Louisiana. A continued custody hearing was set for August 23, 2022. At the time of the initial removal, L.W.'s whereabouts were unknown. She had been escorted off hospital grounds after hospital staff found her using IV drugs in the bathroom.
>
> On August 23, 2022, the juvenile court signed a continued custody order in favor of the State, finding reasonable grounds to believe P.P. to be a child in need of care and that continued custody was necessary for the child's safety and protection, by stipulation of the mother. A Court Appointed Special Advocate (CASA) was appointed for the child and an adjudication hearing was set for October 20, 2022.
>
> On September 8, 2022, the State filed a Petition for Custodial Child in Need of Care. It alleged that P.P. is in need of care pursuant to La.Ch.Code art. 606(A), asserting that, on August 11, 2022, DCFS received a report for a drug-affected newborn and found P.P.'s

---

[1]     Initials of the parties are used to protect the identity of the minor child. Uniform Rules – Courts of Appeal, Rules 5–1, 5–2.

meconium drug screen was positive for amphetamines, methadone, fentanyl, gabapentin, and methamphetamines. The mother, L.W.[,] admitted to the caseworker that she was going to a Veteran's Administration Hospital drug treatment facility and that she had abused illegal drugs for about two years. The State further argued that D.P. is an alleged father and that he was not cooperative with the caseworker during her investigation, telling the worker that she would not be allowed in his house because he does not trust the agency. As a result, the caseworker was unable to assess his living situation for consideration of being a caretaker. D.P. admitted to being escorted off hospital grounds but stated he did not understand why it was done. The State's petition also noted that K.S. is an alleged father as well and that he agreed to submit to a paternity DNA test to determine if he is in fact P.P.'s father. The State concluded that due to a positive meconium drug screen for P.P., D.P.'s unwillingness to work with the caseworker, and L.W.'s current substance abuse issues, P.P. should be adjudicated a child in need of care.

The adjudication/disposition hearing was held on October 20, 2022. By the time of the hearing, L.W. was deceased. K.S., who was represented by appointed counsel but who was not present personally, had been excluded as the father as a result of a negative DNA paternity test, and his counsel was relieved of further representation at the hearing. D.P. appeared, with counsel. P.P. was also represented by counsel.

At the conclusion of the hearing, the juvenile court found that the State proved the allegations of the petition by a preponderance of the evidence, and that the evidence warranted adjudication of P.P. as a child in need of care. The juvenile court ordered custody to be maintained with DCFS, having found the State made reasonable efforts, with the child's health and safety as its paramount concern, to prevent or eliminate the need for removal of the child from the home and, after removal, to reunify the parents and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan.

*State in Interest of P.P.*, 23-38, pp. 1–4 (La.App. 3 Cir. 6/21/23), 368 So.3d 250, 252–53 (footnotes omitted).

This court affirmed the trial court's adjudication of the child as a child in need of care. Since the time of the first appeal, the case continued with a goal toward reunification with the father. The child is living with the maternal grandmother. As part of his case plan, the father was required to secure adequate housing, establish

2

financial stability, secure a mental health assessment and treatment, attend parenting classes, and attend visitation with the child.

At the November 30, 2023 case hearing, the goal was changed to adoption, with the visitation schedule remaining the same. A judgment was signed on December 12, 2023. It is from this judgment that the father filed the present appeal.

**DISCUSSION**

The father disputes the trial court's change of the case plan goal from reunification to adoption. The father argues that the trial court erred in finding that he had not substantially complied with his case plan and that DCFS provided efforts in assisting him to complete his case plan.

When the primary case plan goal is changed to adoption, the manifest error standard of review applies to the trial court's determination. *State in Interest of R.B.*, 19-254 (La.App. 3 Cir. 10/2/19), 281 So.3d 737, *writ denied*, 19-1781 (La. 1/28/20), 291 So.3d 1053.

A two-part inquiry is necessary to reverse the trial court's determination when the manifest error standard of review applies: (1) the appellate court must examine the record to determine whether a reasonable factual basis does not exist for the trial court's finding of fact, and (2) the appellate court must further decide that the record also establishes that the trial court's finding was clearly wrong. *Id.*

Louisiana Children's Code Article 1036(C) provides the proof necessary to establish lack of compliance by a parent with a case plan as follows:

> Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
> (2) The parent's failure to communicate with the child.

3

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

Mere cooperation by a parent is not the sole focus of a permanency plan. The court must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the child from the parent's care. Stability in the home environment and relationships are considerations in the permanency plan determination. A parent who asserts an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated.

*State in Int. of E.M.J.*, 52,082, p. 10 (La.App. 2 Cir. 4/11/18), 249 So.3d 170, 176.

On October 26, 2022, the father completed an assessment with Debra Smith, LMSS, of Caring Choices in Alexandria. She determined that he suffers from narcissistic personality disorder and passive aggressive personality disorder. She noted that the father believed that there was no reason for DCFS to interfere in his life regarding the child. Ms. Smith observed that the father "is not likely to engage in any type of treatment, as his perception of himself is smart, powerful, well-connected to powerful individuals, and not in need of any services." He reported that he has twelve children. He stated he takes care of all his children, but they all live with their individual mothers. She suggested the father would benefit from insight-oriented therapy or cognitive therapy.

Ms. Smith referred the father to Dr. Danna Andrus for counseling because she found the father to be "non-compliant, defiant, and [that he] would not listen to

reasoning." However, this session never materialized, and weeks later, Dr. Andrus received a referral from DCFS. Dr. Andrus noted that the father is emotionally and verbally combative and very angry. Dr. Andrus observed that the father speaks very loudly and stated that "[t]he elevated volume of [the father's] voice, suggests that he possibly uses such verbal tactics as a ploy in which to intimidate or try to display to others that he is knowledgeable and knows what he's talking about." Dr. Andrus noted that what DCFS is requesting is standard protocol, though he was not sure if the father would comply with its request regarding the welfare of his daughter.

At the November 30, 2023 hearing, Falon Jackson, a foster care worker, testified that the father had yet to undergo therapy as recommended by Ms. Smith. She also testified regarding the father's attendance at parenting classes. Initially, DCFS recommended that he attend classes at the Volunteers of America (VOA). However, there was a verbal altercation at the VOA. The father was allowed to come back and attended six sessions but was discharged for making threats toward a staff member. During this time, the staff observed the father with his daughter but noted there was no bonding. He was on the phone or conversing with someone and did not attempt to play with his daughter. He would keep her in the stroller and not try to comfort her when she was crying. The staff was concerned that he did not pay much attention to his daughter's emotional needs. After his dismissal from the VOA program, the father was referred to another parenting class program and completed that program.

While Ms. Jackson agreed that the father attends visitation with his child, she stated the sessions are a little bit rocky, but agreed it is a work in progress. Ms. Jackson noted that the child is very bonded to the grandmother, so it does take a while to bond with the father at the sessions. The record indicates that the sixty-one-

year-old father has from twelve to fifteen children. The child does enjoy visiting with her fourteen-year-old half-sister when she also comes to visit with the father.

Ms. Jackson also testified that the father has brought the child clothing on occasion and maybe a stuffed animal. However, he has not contributed diapers or any other type of item. She agreed that child support had yet to be set by support enforcement. The father testified that he did not bring things to the child because her maternal grandmother whom she lives with would not give them to her if he did.

The father's actions that led to the child's adjudication as a child in need of care have not changed much since his last appeal. First, he continues to argue that he had nothing to do with the mother abusing drugs while she was pregnant with the child, though that drug use eventually caused her death. While this may be partially true, he fails to acknowledge his role in it. However, there is evidence in the record that the mother was living with him when she was pregnant, and yet, he sought no help for her.

Since the birth of the child, the father has consistently refused DCFS entry into his home to evaluate it. He has had many excuses and claims that he is trying to secure appropriate housing with enough bedrooms since he has his fourteen-year-old daughter and a nineteen-year-old son living with him. He has a voucher that would allow him housing but says he needs proof that the child will be living with him. Ms. Jackson testified that he was provided a list of available houses by the HUD worker assigned to him. She testified he needs to do his own research on what homes are available that will take a HUD voucher.

The record also establishes that the father has no support system in place as required by his case plan. He did offer the name of a friend, the sister of the mother of four of his children, who agreed to help him take care of his daughter. DCFS was

6

able to assess her home, which was adequate. However, the friend never appeared for her background check appointment and never called to schedule another appointment.

In changing the goal from reunification to adoption, the trial court stated:

I think that what I'm struck with is that the housing issue, the bonding, the support system, the parental support, the mental health treatment that is not occurring, all of that has gone off for these . . . fifteen months of this child's life. And, and I believe that it's occurred, uh, because of your stubbornness, of your resistance to do the things that you know or, or have been told that need to be done in order for all of this to, to end in reunification. I just don't buy the issues with housing, uh your, your explanation for. Uh, you made the, the choice of having a child. We don't get the house first, and then we get the child. We got the child and you, you need to go, you need to go ahead and either have your current home approved or make arrangements for the housing. You need to do all of those things. So, what, what's gone on to this date is not working.

While the father completed some components of the case plan, he has consistently refused access to his home to assess the living conditions. He claims he needs to get a home with more bedrooms so he can have a separate room for his daughter, but he makes no efforts toward reaching this goal. There is also no reason to refuse access to allow DCFS to ascertain the present living conditions so that it can be determined if he can properly care for a young child in his home. While he indicated he had a friend who could provide support in raising the child, this friend is not eager to complete the required assessments.

As required by the case plan, the father has not sought mental health treatment that the professionals have deemed he needs. While he attends regular visitation with the child, things do not go very smoothly.

Based on the facts before this court, we find no manifest error in the trial court's decision to change the case plan goal to adoption, while still allowing

visitation and the possibility of reunification. The judgment of the trial court is affirmed. Costs of this appeal are assessed to the father.

**AFFIRMED.**